**Opinion filed July 7, 2023**



In The

# Eleventh Court of Appeals

_____

## No. 11-21-00269-CR

_____

## DAMIEN DUBREE SMITH, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 161st District Court**
**Ector County, Texas**
**Trial Court Cause No. B-21-0191-CR**

## M E M O R A N D U M   O P I N I O N

On December 6, 2020, Crystal Araiza was murdered by a gunshot to her face in a dispute over payment of an additional ten dollars for the purchase of methamphetamine. Appellant, Damien Dubree Smith, was indicted for that murder. In Count One of the indictment, the State alleged that Appellant committed the offense of felony murder, to wit: he committed or attempted to commit an act clearly dangerous to human life by shooting at or in the direction of Araiza with a firearm,

causing her death, while in the course of and in furtherance of, or in immediate flight from, his commission or attempted commission of a felony, namely, his possession of a firearm having previously been convicted of a felony offense. *See* TEX. PENAL CODE ANN. §§ 19.02(b)(3), 46.04(a) (West 2019 & Supp. 2022). In Count Two, the State alleged that Appellant committed the offense of murder. PENAL §19.02(b)(1), (2). The jury found Appellant guilty of felony murder as alleged in Count One.[1] Based on Appellant's pleas of "true" to two enhancement allegations, the jury found the enhancements to be true and assessed his punishment at life imprisonment in the Institutional Division of the Texas Department of Criminal Justice and a $5,000 fine. *See id.* § 12.42(d). The trial court sentenced Appellant accordingly. In his sole issue on appeal, Appellant challenges the sufficiency of the evidence supporting his conviction. We affirm.

*Factual History*

At approximately 2:30 a.m. on December 6, 2020, Yessica Castillo, Appellant's roommate, called the 9-1-1 to report that her boyfriend found the body of a woman across the street from her house, who had been shot in the face. Although Castillo testified that she had seen Appellant around the same time that the victim was discovered, Castillo did not inform police that Appellant had been there when they arrived at the scene. Castillo testified that she saw Appellant get into a dark vehicle across the street from her house in the early morning hours on the day the body was found, and that she later heard a sound like a backfire, followed by screaming. Upon hearing this, Castillo looked at the security camera. She saw Appellant get out of the dark vehicle and get back into the vehicle he had been driving—both vehicles then "drove away." Castillo's boyfriend saw what appeared to be a blinking light, later determined to be the victim's cell phone, on the sidewalk

---

[1]The trial court granted the State's motion to dismiss Count Two based on the jury's guilty verdict on Count One.

across the street. Castillo's boyfriend went to investigate and found the body of a deceased woman lying on the sidewalk with a gunshot wound below her left eye.

Detective Donaciano Rocha with the Odessa Police Department (OPD) identified the victim by her driver's license as Araiza. Detective Rocha recovered Araiza's cell phone from the scene and discovered that she had most recently been in contact with two individuals, Jennifer Portillo and Appellant. Further investigation revealed that Portillo, her fiancé Hayley Staggs, Araiza, and Appellant had all agreed to meet to consummate a drug transaction that night. With this information, police made efforts to locate Portillo, Staggs, and Appellant.

Portillo testified that she contacted Araiza so that Portillo and Staggs could obtain drugs prior to leaving Odessa for Texarkana. Araiza represented that she could help them buy some methamphetamine. Araiza was going to pay for the drugs in exchange for Portillo and Staggs giving her a ride to a game room. Araiza put Portillo and Staggs in contact with Appellant to set up the exchange for drugs. Appellant told Portillo and Staggs to meet him at a location near his house. Portillo, Staggs, and Araiza arrived at the designated meeting spot and waited there for approximately ten minutes. While waiting for Appellant, Araiza told Portillo and Staggs that Appellant was a woman beater, and that he was not a person that she liked or regularly dealt with.

Appellant arrived at the meeting spot in a gray vehicle, and he parked it in a driveway across the street from the trio, who were in another vehicle driven by Portillo. Appellant crossed the street and got into the vehicle. Portillo was in the driver's seat, Staggs was in the front passenger seat, Araiza was in the rear driver's side seat, and Appellant was in the rear passenger's side seat. Staggs told Appellant that they wanted "a twenty" or $20 worth of methamphetamine. Appellant bagged a single "rock" of methamphetamine and handed it to Portillo; Staggs then "put it in her bra." Portillo testified that the atmosphere in the vehicle was "agitated" during

3

the exchange. After giving Portillo the drugs, Appellant demanded his money. But Araiza stalled Appellant telling him that "I will match you at the game room" implying that Appellant would get his payment somehow from game room winnings. Araiza had tendered Appellant only $10, not the full $20. At that point, Appellant got a phone call from Castillo, warning him that he had better not be dealing drugs in front of her house. After the phone call, the mood inside the vehicle became very tense. In this atmosphere of mounting hostility, Portillo located and intended to hand Appellant the remaining $10 to complete the transaction, but before she could do that, Staggs stopped her.

Staggs testified that she then turned around and saw Appellant with a gun to Araiza's head and watched as Appellant pulled the trigger. Portillo testified that she saw Staggs put her hands up to her face in fear and heard Staggs scream "no, no, no" before hearing a gunshot. Portillo then turned around and saw that Araiza had been shot. Appellant got out of the vehicle, returned to his vehicle, and drove away.

Portillo and Staggs removed Araiza's body from the vehicle, left it on the sidewalk, and fled the scene. Before leaving town, Portillo and Staggs attempted to clean some of the blood out of their vehicle and then drove to Texarkana without informing the police about the murder. At some point on the drive, they discovered the bullet casing from the shooting and they "threw it out" of the vehicle. Upon their arrival in Texarkana, having been informed that the police were looking for them, the two agreed that the following morning Staggs would call her probation officer and explain what had occurred.

The next morning, Staggs called her probation officer and reported that she and Portillo had witnessed the shooting but maintained that they had not been involved. The Texas Rangers interviewed both Portillo and Staggs upon their surrender. Staggs initially lied during her interview and said that the shooting had happened in the front yard where Araiza's body was found, not in the vehicle.

4

Consistent with her testimony at trial, Portillo told a Texas Ranger that Appellant shot Araiza inside their vehicle. Following their interviews, Portillo and Staggs were both arrested for the murder of Araiza.

During the investigation, Detective Rocha learned that Appellant's name had changed on the Facebook profile that he had used to message Araiza, and that the profile had then been deleted altogether. Using cell phone data to locate Appellant by triangulating cell phone towers, Appellant's location was traced to a game room. Undercover officers then followed Appellant when he left the game room. OPD Sergeant Justin Caid testified that Appellant drove in a manner consistent with a person who wanted to avoid being followed. Appellant parked and exited his vehicle then shortly thereafter got back in the vehicle. The police began surrounding him and he exited the vehicle and fled on foot. Officers apprehended Appellant who then resisted arrest. After Appellant was subdued, he was placed in police custody and interviewed by Detective Rocha.

Appellant frequently changed his story while being interviewed by Detective Rocha. Initially, Appellant denied ever having met with Araiza, Portillo, and Staggs. He later changed his story to say that he did meet with them but that he left before Araiza was shot. Appellant then changed his story—yet again—to say that he was there and that he saw Staggs shoot Araiza.

In the interview, Appellant gave statements to Detective Rocha that were later contradicted by the evidence. Appellant told Detective Rocha that he did not own or carry a weapon. But that was disputed by text message information discovered on Appellant's cell phone that referenced his possession of a gun. Further, an acquaintance of Appellant's testified that she had actually given Appellant a gun the night that Araiza was murdered. In his interview with Detective Rocha, Appellant also claimed that, on the evening in question, he had been sitting in the rear driver's seat of the subject vehicle, but the forensic evidence from within the vehicle

5

disproved this statement as well. In the interview, Appellant initially denied deleting his Facebook profile, but he later admitted that he had indeed deleted it.

A digital forensic technician for OPD testified that she was able to use Appellant's cell phone to extract information that he had made a number of incriminating internet searches after Araiza's death. Appellant had searched for criminal defense attorneys, how to manage his cell phone location tracking technology, whether a Ford EcoSport (the vehicle he was driving the night of the murder) had a GPS locator, and the news websites of the Odessa American and the Ector County Sheriff's Department.

*Standard of Review and Applicable Law*

We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288−89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018); *Brooks*, 323 S.W.3d at 895; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

Viewing the evidence in the light most favorable to the verdict requires that we consider all evidence admitted at trial, including improperly admitted evidence. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We defer to the factfinder's credibility and weight determinations because the factfinder is the sole judge of the witnesses' credibility and the weight that their testimony is to be afforded. *Winfrey*, 393 S.W.3d at 768; *Brooks*, 323 S.W.3d at 899. The *Jackson* standard is deferential to the factfinder's resolution of conflicts in the testimony, the weight afforded the

6

evidence, and reasonable inferences drawn from the facts. *Jackson*, 443 U.S. at 319; *Zuniga*, 551 S.W.3d at 732; *Clayton*, 235 S.W.3d at 778. We may not reevaluate the weight and credibility of the evidence to substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Instead, we determine whether the necessary inferences are based on the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Clement v. State*, 248 S.W.3d 791, 796 (Tex. App.—Fort Worth 2008, no pet.). Accordingly, if the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Merritt* v. State, 368 S.W.3d 516, 525−26 (Tex. Crim. App. 2012); *Clayton*, 235 S.W.3d at 778.

"Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Merritt*, 368 S.W.3d at 525. Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Because evidence must be considered cumulatively, appellate courts are not permitted to use a "divide and conquer" strategy for evaluating the sufficiency of the evidence. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). Instead, appellate courts must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017).

Finally, we measure the legal sufficiency of the evidence by the elements of the offense as defined by the hypothetically correct jury charge for the case. *Morgan v. State*, 501 S.W.3d 84, 90 (Tex. Crim. App. 2016); *see also Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the

State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240.

*Analysis*

In his sole issue on appeal, Appellant challenges the sufficiency of the evidence to support his conviction. Appellant raises multiple arguments, which he contends rebut the evidentiary bases of his conviction.

Count One of the indictment alleged that Appellant committed or attempted to commit an act clearly dangerous to human life by shooting at or in the direction of Araiza with a firearm, causing her death, while in the course of and in furtherance of, or in immediate flight from, the commission or attempted commission of a felony, namely, his possession of a firearm by a felon.

While Appellant concedes on appeal that Araiza was murdered in Ector County, on or about December 6, 2020, he challenges the sufficiency of the evidence as to whether he "*intentionally or knowingly* caused the death of an individual." However, Appellant was not convicted of murder as described in Section 19.02(b)(1), which requires that one must "intentionally or knowingly" cause the death of another.[2] *See* PENAL § 19.02(b)(1). Instead, Appellant was convicted of felony murder under Section 19.02(b)(3), which unlike murder, does not require a culpable mental state. A person commits the offense of felony murder when they commit or attempt to commit an act clearly dangerous to human life while in the course of and in furtherance of, or in immediate flight from, the commission or attempted commission of a felony that causes the death of an individual. *See* PENAL § 19.02(b)(3); *see also Lomax v. State*, 233 S.W.3d 302, 305 (Tex. Crim. App. 2007) ("Section 19.02(b)(3) dispenses with a culpable mental state . . . the very essence of [the felony murder statute] is to make a person guilty of an 'unintentional'

---

[2]As discussed above, this conduct was alleged in Count Two of the indictment, which was dismissed.

8

murder when he causes another person's death during the commission of some type of a felony."); *Walter v. State*, 581 S.W.3d 957, 970 (Tex. App.—Eastland 2019, pet. ref'd) ("[T]he plain language of the felony murder statute requires proof of the underlying felony, but it does not require any proof of an accompanying mental state with regard to either causing the death of another or committing an act clearly dangerous to human life. Thus, Appellant could have been convicted of felony murder under Section 19.02(b)(3) *without a showing that [Appellant] intended to kill [the victim]*.") (emphasis added).

The indictment alleged that the offense committed by Appellant was the unlawful possession of a firearm by a felon and the dangerous act was shooting at or near Araiza. Notwithstanding Appellant's argument that the evidence was insufficient as to an *intentional or knowing* mental state, which are not elements of felony murder, the offense of conviction, we regard the substance of Appellant's argument as directed to the underlying felony and dangerous acts as described in Count One. *See Walter*, 581 S.W.3d at 970. The offense for which Appellant was convicted, felony murder, is "an unintentional murder committed in the course of committing a felony." *Rodriguez v. State*, 454 S.W.3d 503, 507 (Tex. Crim. App. 2014) (quoting *Fuentes v. State*, 991 S.W.2d 267, 272 (Tex. Crim. App. 1999)); *Lomax*, 233 S.W.3d at 305. Measuring the sufficiency of the evidence against the elements of this offense as defined by the hypothetically correct jury charge per *Morgan* and *Malik,* we therefore review and discuss the contested elements of Appellant's felony murder conviction. *See Morgan*, 501 S.W.3d at 90; *Malik*, 953 S.W.2d at 240.

Appellant first argues that the evidence was insufficient to support his conviction because Portillo and Staggs hindered the investigation of Araiza's murder by fleeing the scene, disposing of the bullet casing, and attempting to remove Araiza's blood from their vehicle. Appellant also argues that Portillo and Staggs

alone benefitted from Araiza's death because they obtained the drugs they wanted without payment. On the other hand, Appellant argues that he did not benefit from the murder because he never retrieved his drugs after Araiza was shot. Appellant also contends that Staggs' testimony was not credible because her story was inconsistent regarding the way the drugs were given to her by Appellant. Although Portillo and Staggs did testify to not only fleeing but disposing of evidence, these admissions do not contradict the evidence that supports Appellant's conviction. In fact, there was testimony that Appellant did the same things: that Appellant fled the scene at the time of the shooting and that he later fled from police while being pursued after leaving the game room. Detective Rocha also testified that Portillo's identification of Appellant as the shooter was more consistent with the physical evidence and the blood found inside the vehicle. Further, we assume that any inconsistencies in the testimony given by Staggs or others was weighed by the jury who made their own determinations about the credibility of conflicting evidence and testimony and that the jury resolved such inconsistencies in favor of the verdict. *Jackson*, 443 U.S. at 326; *Brooks*, 323 S.W.3d at 899; *Clayton*, 235 S.W.3d at 778.

Second, Appellant argues that he is a large individual and that a "reasonable person" would have "to question how he could [have] quickly" accessed a firearm while in the confines of the vehicle. Appellant argues that, under the circumstances presented, a reasonable person would have concluded that Appellant could not physically have been the one who shot Araiza. Further, Appellant was seen leaving the vehicle while actually patting *himself* down as if checking for a personal injury, which, according to Appellant, implies is consistent with a person other than himself having discharged the firearm. But, neither Appellant's inability to quickly access his weapon nor that he was "checking himself for injury" by patting himself down were testified to or discussed at trial. Further, Appellant did not explain, nor is it

clear, why or how Appellant's size would have prevented him from accessing a firearm.

Third, Appellant contends that, because the medical examiner testified that the gunshot that killed Araiza could have been fired from up to a foot away, Staggs's testimony that she saw Appellant put the gun directly to Araiza's face is not supported by the evidence. Again, although the medical examiner did so testify, such testimony does not contradict the evidence supporting Appellant's conviction. Staggs testified that she saw Appellant put the gun up to Araiza's face. To be precise, the medical examiner testified that the shot could have been fired from *up to* a foot away, stating, "that puts us within like a couple of inches to about a foot away from [Araiza's] skin at the time the gun was fired." When pressed, the medical examiner further stated:

> Q. Okay. But in this particular case, because we have that soot [deposited on Araiza's face], we are within inches of her face from where that barrel is to her eye, right, Doctor?
>
> A. Yes.

Accordingly, there is expert and eyewitness testimony in the record that the gun was fired from closer than a foot away. Based on this evidence, the jury could have reasonably believed beyond a reasonable doubt that Appellant fired the fatal shot.

Finally, Appellant argues that Castillo testified that she had never seen him with a gun. Although his roommate may not have *seen* Appellant with a gun, there was testimony from Appellant's acquaintance that, the day before the shooting, Appellant was provided a nine-millimeter Smith and Wesson pistol. Texts messages retrieved from Appellant's cell phone also corroborate Appellant's possession of a gun.

While, at most, Appellant's arguments on appeal identify *some* conflicting evidence, the jury weighed the conflicting evidence and resolved those conflicts

contrary to Appellant's positions taken here and at trial. *See Jackson*, 443 U.S. at 326; *Merritt*, 368 S.W.3d at 525−26; *Clayton*, 235 S.W.3d at 778. The record supports a reasonable belief that Appellant had been given a gun, and there was eyewitness testimony that Appellant shot Araiza. Despite Appellant telling the police that Staggs shot Araiza, Portillo's testimony directly contradicted this claim and implicated Appellant as the shooter. Following the shooting, Appellant attempted to hide from the police. When questioned, Appellant lied to the police and changed his story multiple times about his involvement in the shooting. Appellant's cell phone search history includes a search to locate criminal defense attorneys and find ways to manipulate his cell phone GPS location technology shortly after Araiza was killed. Viewing the evidence in the light most favorable to the verdict, and presuming the jury resolved any conflicts in favor of that verdict, we conclude that the evidence is sufficient to support the jury's conviction. We overrule Appellant's sole issue.

## Modification of Judgment

Although not raised by either party, we note that the trial court's judgment contains a clerical error. We have the authority to modify a judgment to correct a clerical error when the evidence necessary to correct the judgment appears in the record. *See* TEX. R. APP. P. 43.2(b); *Arndt v. State*, No. 11-20-00032-CR, 2021 WL 5934652, at *3 (Tex. App.—Eastland Dec. 16, 2021, pet. ref'd) (mem. op., not designated for publication) (citing *Bigley v. State*, 865 S.W.2d 26, 27 (Tex. Crim. App. 1993)). The judgment of conviction for Count One shows that the jury convicted Appellant of the offense of murder, as found in Section 19.02(c). We modify the judgment to reflect that the "Statute for Offense" for which Appellant was convicted is "Texas Penal Code § 19.02(b)(3), (c)."

*This Court's Ruling*

As modified, we affirm the judgment of the trial court.


W. BRUCE WILLIAMS

JUSTICE


July 7, 2023

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.